NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

VINTAGE SPEEDSTERS OF CALIFORNIA, *Plaintiff/Appellee*,

*v.*

VINTAGE MOTORCAR LTD, *Defendant/Appellant*.

No. 1 CA-CV 21-0501
FILED 6-14-2022

Appeal from the Superior Court in Maricopa County
No. CV2019-051077
The Honorable Theodore Campagnolo, Judge

**AFFIRMED**

COUNSEL

Sherrets Bruno & Vogt LLC, Scottsdale
By Jason M. Bruno, Robert S. Sherrets
*Counsel for Plaintiff/Appellee*

Perry-Meier & Associates PLLC, Phoenix
By Janae Perry-Meier
*Counsel for Defendant/Appellant*

_____

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the court, in which Presiding Judge Jennifer B. Campbell and Judge James B. Morse Jr. joined.

_____

**H O W E**, Judge:

**¶1**        Appellant Vintage Motorcar Ltd. ("Motorcar") challenges the trial court's granting summary judgment to Appellee Vintage Speedsters of California ("Speedsters") on its claim that Motorcar breached the parties' asset purchase agreement by failing to make royalty payments. We affirm.

**FACTUAL AND PROCEDURAL HISTORY**

**¶2**        Speedsters and Motorcar entered an agreement in 2017 that Motorcar would purchase most of Speedster's assets ("Asset Purchase Agreement" or "APA"). The assets included two molds used to build bodies for certain Porsche Speedster models and Speedster's rights under a "Body Contract" with Peregrine Industries ("Peregrine"), which manufactured the Speedster bodies. The Body Contract memorialized a "standing agreement . . . that Peregrine . . . will not produce a 'speedster' or anything that resembles a speedster" for anyone other than Speedsters, with those exclusivity rights "transferable only by . . . Speedsters." The Body Contract also memorialized the "transfer [of] production rights as well as the ownership of the molds" to Motorcar and stated that "[p]ricing, service and delivery [would] remain the same."

**¶3**        In the APA, Motorcar agreed to pay an initial $200,000 followed by royalty payments of $3,000 for each of the first fifty vehicles it sold and $2,000 for each vehicle sold thereafter not to exceed a total payment of $300,000. About a year later, the parties entered an Amended APA that changed the royalty terms as follows:

> Buyer shall pay Seller four (4) Royalty Payments of $6,000.00 per month from September 2018 through December 2018.
>
> Buyer shall pay Seller fourteen (14) Royalty Payments of $8,000.00 per month from January 2019 through February 2020.

> Buyer and Seller expressly agree that if any Selling Party breaches any of its obligations or defaults under the Purchase Agreement, the Non-Competition Agreement, or any other Transaction Document, *or if the Body Contract does not remain in full force and effect for a period of at least two (2) years following Closing in accordance with Paragraph 2.5 of the Purchase Agreement*, then (i) Buyer's obligation to make any further Royalty Payments shall immediately cease, (ii) the Royalty Agreement shall be deemed immediately terminated, and (iii) Seller and the other Selling Parties shall not be entitled to any Royalty Payments as set forth herein that have not been paid (emphasis added).

Soon after, however, Peregrine went out of business. As a result, Motorcar stopped making royalty payments in October 2018.

¶4　　　　Speedsters sued five months later. The parties cross-moved for summary judgment. Motorcar contended in its motion that its royalty payment obligations had terminated because Peregrine had gone out of business, ending the Body Contract. It also contended that "one of [Speedster's] former employees, Greg Leach . . ., began operating a competing business selling speedster bodies and parts out of [Speedster's] former business location, using [its] former employees." Motorcar's owner, Michael Teerink, stated in his deposition that the price per mold has increased over $1,000 since "the agreement."

¶5　　　　Speedsters contended, however, that "Motorcar continue[d] to enjoy the benefits of the Body Contract and will continue to do so in the future" through Leach's company. Leach stated in his deposition that he did not formally assume the Body Contract and had never seen it. He stated that he managed the day-to-day operations at the Peregrine facility, had leased Peregrine's building, and had hired its employees. While Leach's business was not Peregrine, it did use Motorcar's molds to make speedster bodies only for Motorcar. The bodies that he made for his own business were not from Motorcar's molds. Finally, Leach stated that any increase in the cost of the molds was due only to increased labor, shipping, and material costs.

¶6　　　　The trial court granted Speedsters summary judgment, finding that Leach had "assumed the manufacturing and delivery operations that were previously performed by Peregrine" and that Motorcar "has never made demand . . . for non-performance under the Body Contract, nor ha[d it] challenged Greg Leach's takeover of Peregrine

Industries' operations." On that basis, the trial court concluded that "the terms of the Body Contract are being fully performed, and that the Body Contract remains in full force and effect." The court also awarded attorney fees, costs, and Arizona Rule of Civil Procedure 68 sanctions to Speedsters. Motorcar timely appealed.

## DISCUSSION

¶7        Motorcar appeals the trial court's summary judgment ruling arguing that it erred in granting Speedsters summary judgment because (1) the Body Contract terminated when Peregrine went out of business; (2) Leach materially violated the Body Contract's "Pricing, Servicing, and Delivery" Terms; (3) Leach violated the Body Contract's exclusivity provision; and (4) a genuine dispute of fact existed that precluded summary judgment. In reviewing the trial court's rulings on cross-motions for summary judgment, we consider questions of law de novo but review the facts in a light most favorable to the party against whom summary judgment was granted. *Matter of Estate of Podgorski*, 249 Ariz. 482, 484 ¶ 8 (App. 2020). The court should grant summary judgment only if it finds that no genuine issues of material fact exist, and that one party is entitled to judgment as a matter of law. *Grain Dealers Mut. Ins. Co. v. James*, 118 Ariz. 116, 118 (1978).

¶8        We review the trial court's interpretation of the APA, Amended APA, and Body Contract de novo. *ELM Ret. Ctr., LP v. Callaway*, 226 Ariz. 287, 290 ¶ 15 (App. 2010). Our purpose in interpreting contracts is to determine and enforce the parties' intent. *Terrell v. Torres*, 248 Ariz. 47, 49 ¶ 14 (2020). To determine the parties' intent, we look to the plain meaning of the words as viewed in the context of the contract as a whole. *ELM*, 226 Ariz. at 290–91 ¶ 15.

**I.        The Trial Court Did Not Err in Granting Summary Judgment to Speedsters.**

      **A.        The Body Contract Did Not Terminate When Leach's Company Took Over Peregrine's Business.**

¶9        Both the APA and Amended APA state that Motorcar's royalty obligations "immediately cease" if "the Body Contract does not remain in full force and effect" for at least two years after closing. Motorcar contends these provisions create a condition subsequent that was triggered when Peregrine went out of business. Motorcar bore the burden to show this condition subsequent occurred and excused its royalty payment

obligations. *Clark v. Compania Ganadera de Cananea, S.A.*, 95 Ariz. 90, 93 (1963).

¶10        The Body Contract did not stop being in full force and effect merely because Peregrine went out of business. Teerink testified that Leach was "running [Peregrine's] business operations." Leach similarly testified that while his company did not formally assume the Body Contract, it (1) leased the building Peregrine had leased, (2) hired Peregrine's employees to continue to do the same work, and (3) managed the day-to-day operations of what used to be the Peregrine plant. Neither the APA nor the Body Contract required Peregrine to formally assign its Body Contract rights and obligations, and nothing in the Body Contract suggests that it would terminate if Peregrine assigned the contract. *Cf.* Restatement (Second) of Contracts § 317(2)(c) (1981) (barring assignment of contractual rights if assignment is "validly precluded by contract"); *see also Highland Village Partners, L.L.C. v. Bradbury & Stamm Const. Co.*, 219 Ariz. 147, 150 ¶ 11 (App. 2008) (relying on Restatement (Second) of Contract § 317(2)). Motorcar's argument that the Body Contract terminated upon Peregrine going out of business is therefore unavailing.

### B.        The Court Did Not Err in Finding No Material Breach of the Body Contract's "Pricing, Service and Delivery" Terms.

¶11        Motorcar contends that "pricing, service and delivery" changed when Leach's company took over Peregrine's operations. The Body Contract states that pricing, service, and delivery would "remain the same," but Motorcar does not establish what those terms were between Speedsters and Peregrine.

¶12        The only evidence on pricing is Teerink's testimony that the price for a body had increased "nearly a thousand dollars since the inception of this agreement." What agreement Teerink referenced is unclear. Moreover, no evidence suggests Speedsters and Peregrine agreed to keep prices static for any specific period. Nonetheless, Leach testified, and Motorcar does not dispute, that any price increase would have been due to increases in labor, shipping, and material costs. And Teerink conceded that he had not asked Leach to revert to any earlier prices or to return the molds.

¶13        As for changes to service, Teerink stated only that Motorcar now communicated with a different person to place orders. And as for delivery, Teerink testified that "all of our bodies come through" Leach's company's facility in California—a facility previously leased by Speedsters.

Motorcar's contention that these terms changed in the changeover from Peregrine to Leach's company therefore lacks record support.

### C. Motorcar Did Not Show That It Lost Any Exclusive Production Rights.

¶14 Motorcar also argues that the Body Contract granted it "the exclusive right to anything resembling a speedster manufactured by Peregrine—regardless of the molds used." It also contends that the Body Contract gave it "the right to transfer its rights to exclusive production of speedster bodies (or anything resembling a speedster) manufactured by Peregrine" once the APA became effective. The term on which Motorcar relies provides:

> It is understood and agreed upon that all of the molds are the property of [Speedsters]. Marion Davies and his company Peregrine Industries only produces bodies on these molds for [Speedsters]. Furthermore, a standing agreement exists that Peregrine Industries will not produce a "speedster" or anything that resembles a speedster for any other person or company.

¶15 Generally, contractual terms are interpreted in the broader context of the entire contract. *Apollo Educ. Group, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 250 Ariz. 408, 411 ¶ 11 (2021). Immediately above the quoted term is a description of the two molds Motorcar bought under the APA. Immediately below it is a statement that the "molds and exclusive productions [sic] rights are transferable only by [Speedsters]." Thus, when read in context, the quoted term only bars use of the molds owned by Speedsters/Motorcar to make speedsters, or anything resembling a speedster, for other customers. *See United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 259 (App. 1983) ("A clause in a contract, if taken by itself, often admits of two meanings, when from the whole contract there is no reasonable doubt as to the sense in which the parties use it.") (quoting *Climate Control, Inc. v. Hill*, 86 Ariz. 180, 188 (1959)).

¶16 While the parties agree that Leach's company makes bodies for other customers using other molds, Motorcar presented no evidence that Leach's company uses the molds at issue to make bodies for any other customer. Nor did Motorcar seek to transfer these exclusive rights to anyone else or show that Leach precluded it from doing so. Motorcar's performance under the Amended APA was therefore not excused as a result of Leach's producing his own speedster bodies. *C.f. Zancanaro v.*

*Cross*, 85 Ariz. 394, 400 (1959) ("Ordinarily the victim of a minor or partial breach must continue his own performance, while collecting damages for whatever loss the minor breach has caused him.").

### D.   Teerink's Conclusory Testimony Does Not Create a Genuine Issue of Material Fact.

¶17 Motorcar also contends Teerink's testimony that the Body Contract "is not in effect" establishes genuine issues of material fact. This testimony is based on Teerink's contentions that the "service" and "delivery" terms had been breached and that Leach's company was "selling . . . Speedster bodies to anybody who . . . comes with money." We addressed and disposed of those contentions more fully set forth above. In any event, conclusory testimony does not defeat a motion for summary judgment. *See Florez v. Sargeant*, 185 Ariz. 521, 526–27 (1996). For these reasons, the trial court did not err in granting summary judgment to Speedsters.

## II.   Attorney Fees and Costs on Appeal

¶18 Both parties request their attorney fees incurred in this appeal under A.R.S. § 12–341.01(A), which authorizes a discretionary award to the successful party in an action arising out of a contract. Speedsters is the successful party on appeal and may recover reasonable attorney fees and taxable costs incurred in this court upon compliance with Arizona Rule of Civil Appellate Procedure 21.

## CONCLUSION

¶19 For the reasons stated, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA